AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

```
FILED
CLERK, U.S. DISTRICT COURT

8/3/2025

CENTRAL DISTRICT OF CALIFORNIA
BY:        ER        DEPUTY
```

| | |
|---|---|
| United States of America<br><br>v.<br><br>ROBERT ADRIAN ENE,<br><br>Defendant. | Case No.  2:25-mj-04825-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 1, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(3) | Possession of Fifteen or More Unauthorized Access Devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

/s/
_Complainant's signature_

Nicole Heffernan, Special Agent
_Printed name and title_

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    August 3, 2025 at 9:24 a.m.

_Rozella A. Oliver_
_Judge's signature_

City and state:    Los Angeles, California    Hon. Rozella A. Oliver, U.S. Magistrate Judge
_Printed name and title_

AUSA: Yervant P. Hagopian x0732

## **AFFIDAVIT**

I, Nicole Heffernan, being duly sworn, declare and state as follows:

## I.  **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint against and arrest warrant for Robert Adrian ENE ("ENE") for a violation of 18 U.S.C. § 1029(a)(3) (possession of fifteen or more unauthorized access devices).

2.    This affidavit is also made in support of an application for a warrant to search a cell phone seized from ENE (the "SUBJECT DEVICE") and currently in the custody of Homeland Security Investigations ("HSI"), in Paramount, CA, as described in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with HSI and have been so employed since February 2008.  I am empowered to conduct investigations and to make arrests for federal offenses enumerated in Section 2516 of Title 18 of the United States Code.

6.    I have been employed with HSI since February 2008.  As part of my training with HSI, I attended a twenty-six (26) week training academy at the Federal Law Enforcement Training Center in Glynco, Georgia, which included blocks of instruction on conducting narcotics trafficking and money laundering investigations.  Prior to that, I was employed by the Garden Grove Police Department as a Community Services Officer from 2007 to 2008.  From 2005 to 2007, I was employed by the Orange County Sheriff's Department as a Crime Prevention Specialist. From 2000 to 2004, I was employed by Costa Mesa Police Department as a Community Services Officer.  I possess a bachelor's degree in sociology from California State University at Fullerton and a master's degree in criminal justice from Chapman University.

7.    I am currently assigned to the HSI office in Paramount, California, El Camino Real Financial Crimes Taskforce, which is an enforcement group that investigates federal criminal laws relating to financial institution fraud, credit card fraud, bank fraud, cybercrimes, and identity theft, among other federal criminal offenses.  During my time with HSI, I have led and participated in criminal investigations dealing with a myriad of criminal offenses, to include those mentioned above.

8.    I am familiar with the facts and circumstances of this investigation based on my participation in this investigation, discussions with other officers and agents and foreign law enforcement partner agencies involved in this investigation, my training and experience as an HSI Special Agent, and my familiarity with reports by other law enforcement personnel.

9.    Because this affidavit is being submitted for the limited purpose of securing the requested order, I have not included every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause for the requested complaint and search warrant.  Where statements of others are set forth in this affidavit, they are set forth in substance and in part.

### III. **SUMMARY OF PROBABLE CAUSE**

10.  Between January 2024 and January 1, 2025, the California Department of Social Services ("DSS") has detected more than $126.8 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  This fraud is from two specific programs known as CalFresh and CalWORKS, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

11.  On or about August 1, 2025, at approximately 5:30 a.m., law enforcement conducted physical surveillance at Citibank, located at 12191 Ventura Boulevard, Studio City, CA 91604 ("Target Bank"), which was identified by DSS as one of the top ATM locations for EBT fraud.

12.  At approximately 10:30 a.m., law enforcement observed ENE arrive at an ATM terminal located at Target Bank where law enforcement was conducting surveillance.  ENE possessed 61 access devices, and made numerous balance inquiries at the ATM, in rapid succession, using at least 3 different access devices; ENE made no cash withdrawals.  A balance inquiry is when a device holder enters an access device to check the available cash balance on the account linked to the access device before conducting a cash withdrawal.  Law enforcement detained ENE and found approximately 61 access devices, later determined to be cloned EBT cards.  ENE waived his Miranda rights and acknowledged that he checked account balances to relay them to an unnamed coconspirator.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

13.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Regulatory Background of CalFresh and CalWORKs Programs

14.  DSS is a government agency that administers several benefit and assistance programs for residents of the state of California.  One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs.  Another assistance program administered by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

15.  Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

16.  CalFresh and CalWORKs benefits are issued through EBT cards.  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions.  For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

17.   The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

18.   Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

19.   The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

20.   Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

21.  A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

22.  On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information contained on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

23.  Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

24. The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals. For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number. Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

25. As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming. Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

26. In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area. This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time. Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized

withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

27.  As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud.  Law enforcement surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits.  As a result, law enforcement arrested approximately 16 suspects.  All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States.  All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

28.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area.  Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs.  Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those

withdrawals in rapid succession.  Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022.  One additional defendant possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that the defendant had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023.  All three of these defendants were determined to be citizens Romania, who did not have documentation to be lawfully present in the United States.  The three arrested defendants were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. § 1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

29.  In or about March 2023, federal law enforcement conducted another surveillance and arrest operation in the Los Angeles, California area.  Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs.  Law enforcement arrested eleven suspects that conducted a high volume of unauthorized

transactions and that conducted those transactions in rapid succession.  At the time of their arrest, the suspects had in their possession over 400 cloned cards, $120,000 in illicitly obtained funds, and multiple skimming devices.

30.  Ten out of the eleven of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.

**C.    Background of Current Operation to Combat EBT Fraud**

31.  The most current data provided by DSS, based in part upon reported fraud by victims, indicates that between January 2024 and January 1, 2025, more than approximately $126.8 million in cash benefits was stolen from victim EBT cards throughout California.

32.  Of the more than approximately $126.8 million in cash benefits stolen during this year time period, more than approximately $57.9 million has been stolen from victim EBT cards, in the county of Los Angeles alone.  The majority of these funds were stolen through unauthorized ATM withdrawals.

33.  Between on or about December 1, 2024, and on or about December 31, 2024, according to data from DSS, more than approximately $11.4 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $11.4 million stolen from victim EBT cards in the month of December 2024, more than approximately $6.2 million was stolen, mostly through unauthorized ATM withdrawals, in Los Angeles County alone.

34.  Based upon my training and experience conducting
access device fraud investigations, I know that suspects
committing access device fraud schemes will often target
particular BINs when harvesting stolen card information
collected from skimming devices.  Thus, suspects using skimming
may target the BIN associated with DSS, in essence, targeting
CalFresh and CalWORKs benefits.  Moreover, based upon my
training and experience, the sheer volume of unauthorized ATM
withdrawals occurring during the early days of the month is
further indicative that suspects participating in the fraud
scheme at issue are targeting EBT cards because benefits are
typically disbursed to EBT cardholders during the early days of
each month.

35.  Law enforcement has also reviewed ATM surveillance
provided by financial institutions that administer EBT accounts
that relate to the fraud scheme at issue.  During the
unauthorized ATM withdrawals, suspects can often be seen holding
stacks of cards and conducting withdrawals in quick succession
at one ATM.  Based upon my training and experience, I know that
suspects perpetrating access device fraud schemes will often
conduct unauthorized withdrawals using cloned cards in rapid
succession at ATMs.

36.  Based upon the rapid succession of unauthorized ATM
withdrawals being conducted, the fact that the cards being used
to conduct the unauthorized cash withdrawals are nearly all
cloned EBT cards, and the fact that nearly all of the
unauthorized withdrawals are happening during the early days of

the month, I believe that suspects participating in the fraud
scheme at issue are ostensibly targeting EBT cards.

### D. ENE Committed EBT Fraud By Possessing 61 Unauthorized Access Devices on August 1, 2025

37.  Based upon the large dollar amount being stolen from
victim EBT cards, the number of victims impacted, the
concentration of unauthorized ATM withdrawals occurring in
particular areas, and the large number of unauthorized ATM
withdrawals occurring at singular bank locations, law
enforcement conducted a surveillance and arrest operation in
August 2025.

38.  Based upon my training and experience, my
conversations with other law enforcement personnel, and from my
own participation in this investigation, I know that as an
antifraud measure, Cal DSS places an embargo on EBT accounts,
such that EBT cardholders are not able to conduct cash
withdrawals from their EBT cards until approximately 6:00 a.m.,
on the morning that their funds load (i.e., the 1st, 2nd, or 3rd
of the month, depending on the account).

39.  Based on my review of reports from law enforcement who
conducted in-person surveillance the morning of August 1, 2025,
I know that beginning at approximately 5:30 a.m., law
enforcement began surveillance on the Target Bank.

40.  At approximately 10:30 a.m., based on my review of law
enforcement surveillance video, ENE walked up to an ATM Terminal
at the Target Bank.  There, and over a period of approximately
two minutes, law enforcement saw ENE conduct multiple apparent

account balance checks.  Specifically, ENE removed several cards from his pockets, inserted them individually, but in rapid succession, into the ATM without retrieving any money after either transaction.  In addition, ENE held a large lottery ticket in his left hand to prevent passersby from seeing him repeatedly remove several cloned cards out of his pockets. Based upon my training and experience, I know that subjects involved in EBT fraud often check EBT account balances before conducting a cash withdrawal to verify the available cash balance in the account.  Furthermore, based on my training and experience, I know individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time.

41.  Based on the date, time, ATM location, presence of multiple, and successive ATM transactions during a short time period, law enforcement detained ENE in order to investigate further.

42.  ENE had 61 cloned cards in his vest and pant pockets, which cards consisted of magnetic-striped stored value gift cards such as Vanilla Visa and American Express.  The cards also had stickers placed on them with what appeared to be, based on my training and experience, card balances and/or victim PINs. The following photo is an example of a seized cloned card:



43.  I analyzed the magnetic stripe of the cloned cards and determined all of them were encoded with EBT BINS and mismatching card numbers.  Moreover, the cloned cards also were affixed with stickers bearing four-digit apparent PIN numbers.

44.  During processing, ENE admitted to being a citizen and national of Romania.

45.  Law enforcement queried ENE in U.S. Immigration and Customs Enforcement databases and learned that ENE is lawfully present in the United States.

46.  The SUBJECT DEVICE was retrieved from ENE's right front pants pocket and placed into "airplane mode" to secure the device pending issuance of a search warrant.

47.  After being advised of his Miranda rights and signing a Statement of Miranda Waiver Form, ENE told law enforcement he knowingly used cloned EBT cards at the ATM to check the amount of cash balances on the accounts connected to the cards to

ultimately enable an unnamed third party to conduct cash withdrawals the following day.

## V.  **TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES**

48.  Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.  It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.  Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items

retrieved from stolen mail or mail matter, with their cellphones.

      c.    It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

      d.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

      e.    Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-

conspirators in order to conduct their business. Oftentimes,
they do so on their digital devices. Suspects often use their
digital devices to communicate with co-conspirators by phone,
text, email, and social media, including sending photos.
Suspects may also have paper copies of such records, which they
may keep on their person or in their cars, homes, or storage
units.

      f.    Individuals engaged in mail and identity theft
often use multiple digital devices, which they may keep on their
person or in their cars or homes.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

    49.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet. Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur

---

[1] As used herein, the term "digital device" includes the
SUBJECT DEVICE as well as any electronic system or device
capable of storing or processing data in digital form, including
central processing units; desktop, laptop, notebook, and tablet
computers; personal digital assistants; wireless communication
devices, such as paging devices, mobile telephones, and smart
phones; digital cameras; gaming consoles; peripheral
input/output devices, such as keyboards, printers, scanners,
monitors, and drives; related communications devices, such as
modems, routers, cables, and connections; storage media; and
security devices.

after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain

19

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

51.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

52.  For all of the reasons described above, there is probable cause to believe that ENE has committed a violation of 18 U.S.C. § 1029(a)(3) (possession of fifteen or more unauthorized access devices).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 3rd day of
August, 2025.

_____
THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

21